**Exhibit "B" to Petition to Compel Arbitration**



# Location Master Agreement

This Location Master Agreement (the "LMA"), is made and entered into effect as of the date listed as the "Effective Date" on the first applicable Kiosk Placement Form ("Placement Form") ("Start Date") by and between Lux Vending, LLC d/b/a Bitcoin Depot ("Owner", "Bitcoin Depot"), and the individual or entity listed on the applicable Placement Form(s) as "Location" ("Location"). Together, the LMA and Placement Form(s) constitute the "Agreement". Location and Owner each may be referred to individually as a "party" or collectively as the "parties".

1. **Equipment:** Owner owns or leases kiosks and/or machines that facilitate the purchase and sale of virtual currency, facilitates users to withdraw funds from their bank account(s), and/or certain other functions and owns or has the right to use all software needed for the operation of the kiosk and/or machine ("Kiosk"). Location agrees that Owner may install, operate, and maintain its Kiosk at Location's premises identified in the Placement Form as "Premises" (the "Premises") for the Term (defined below) described in this Agreement.  Each Kiosk will be installed in an indoor, mutually agreeable location on the Premises.  Each Kiosk will be installed to provide an unrestricted view of each Kiosk with adequate room for signage.  Location will provide sufficient space for each Kiosk as is necessary to enable customers to have unobstructed access to each Kiosk and for maintenance and servicing of each Kiosk. Location will make available and maintain a sufficient space for placement, implementation, and maintenance of each Kiosk.  When Owner makes Location aware of a delivery of a Kiosk, Location shall cooperate with Owner in taking delivery and facilitating the installation of each Kiosk, and shall not obstruct or interfere with delivery, operation, or installation of each Kiosk.

2. **Availability:** Location agrees that it shall ensure that each Kiosk shall at all times remain available for use by Location's customers and neither Location, nor any person or entity acting on behalf of or at the direction of Location, shall interfere, directly or indirectly, with the availability or operation of a Kiosk during Location's normal business hours for the Term (defined below) of this Agreement. Owner reserves the right to schedule reasonable downtime to accomplish necessary maintenance and/or system improvements and Location will cooperate with such maintenance and/or system improvements. No maintenance, recovery, or other downtime of a Kiosk shall relieve Location of its obligations hereunder nor shall the same serve to terminate or otherwise abrogate this Agreement.

3. **Location Fees:** Once a Kiosk has been installed on the Premises and is fully operational and accessible for use by the public, Owner shall pay, in accordance with this Agreement, Location a fee equal to the amount listed on the Placement Form alongside that Premises as "Flat Fee" per month throughout the Term (defined below) ("Flat Fee") or the amount listed on the Placement Form as "Per Trans. Fee" as such accrues in accordance with this Agreement ("Transaction Fee"), whichever of the Flat Fee or Transaction Fee is greater ("Location Fee"), subject to this Agreement. For clarity, Location may only receive, subject to this Agreement, either the Flat Fee or the Transaction Fee, whichever is greater, but not both. No Location Fee shall be due for any Premises wherein a Kiosk is broken, inactive, or otherwise non-functioning as a result of or related to the direct or indirect actions of Location or Location Personnel or anyone acting on behalf of the same. "Per Trans. Fee" shall only be due for transactions with a consumer wherein such consumer pays cash in exchange for virtual currency and not for purchases of virtual currency using any other method. No Location Fees shall be due if the Kiosk is not active and installed in the Premises.  Each Premises shall only be entitled to one Location Fee from Owner and, in the case of multiple contracts for payment for a Kiosk, this Agreement shall serve to supersede and replace such prior contracts and multiple payments shall not be due for an individual Premises in any month.

    3.1 Location shall not be entitled to any amounts not expressly set forth in this Section. Any transaction which is fraudulent, canceled, reversed, improper, or otherwise unwound, refunded, or not fully and finally completed shall be deemed invalid and not be considered a billable transaction for purposes of this Section. For purposes of this Agreement, a "transaction" is only billable if the transaction fee billed to each individual consumer is collected by the Owner on a final, non-refundable basis. The Location Fee shall be paid to Location in the month following the month in which the Location Fee accrues. The Location Fee for one Premises shall not be due for any other Premises. Location shall not be entitled to any Location Fee(s),

and Owner may withhold the same, if Location is not fully compliant with the terms, requirements, and conditions of this Agreement.

4. **Title:** Owner reserves and retains all right, title, ownership, license, and/or other such interest in each Kiosk and no grant of the same is intended by nor effectuated by this Agreement. Each Kiosk shall not be transferred or delivered legally or physically to any person other than Owner without prior written consent of Owner from an authorized representative of Owner; neither shall this Agreement nor the bailment be assigned by Location, either by its own acts or by operation of law.  In the event that any creditor of Location enters the Premises for the purpose of taking possession of Location's separate property pursuant to a security agreement, Writ of Possession, Distress Warrant or Writ of Fieri Facias, Location shall identify, designate, and exclude each Kiosk as Owner's property not subject to repossession or execution. Location shall promptly notify Owner in writing of any attempts by any creditor, landlord, or third-party claimant(s) seeking to repossess Location's separate property and/or seeking to execute a Writ of Possession, Distress Warrant, Writ of Fieri Facias, and/or any other such order or action at the Premises. Upon Owner's request, Location shall further identify any such creditors, landlords, or third-party claimant(s) to Owner.  Upon request, Location shall execute and deliver documentation to put third parties on notice of Owner's ownership of each Kiosk.  Notwithstanding the Section Installation/Training, Location acknowledges that each Kiosk is not a fixture of the Premises and Location shall undertake all necessary steps to ensure that each Kiosk does not become a fixture of the Premises.  All cash kept in each Kiosk shall be the property of Owner. For clarity, each Kiosk, in whole and in part, shall always remain as the property and/or licensed materials of Owner. Location shall have no right, title, license, or other such interest in each Kiosk, trade secrets, intellectual property, or Confidential Information (defined below) of Owner and no transfer of the same is contemplated or effectuated, in whole or in part, by this Agreement. Without limitation, at no time shall Location have any property interest, in whole or in part, to any Kiosk.

5. **Installation/Training:** Owner agrees to ship and install each Kiosk at the Premises, train Location's staff as necessary, and deliver initial supplies to Location. Owner reserves sole discretion as to the manner and means of any delivery and/or training hereunder.  Subject to the terms and provisions of the Section Title herein, Owner shall have the right to bolt down each Kiosk, install other security measures, upgrade or otherwise modify each Kiosk, and install appropriate signage at the Premises to advertise the availability of each Kiosk. Where Owner attempts to deliver and/or install a Kiosk at a Premises, Location shall take all necessary steps to facilitate and permit Owner to perform such delivery and/or installation. Where Location delays, refuses, interferes, or otherwise prohibits Owner from such delivery and/or installation, Location agrees that Owner shall be entitled to a refusal fee in the amount of five hundred ($500) dollars per such refusal, interference, or other delay in installation and/or delivery ("Refusal Fee"). Owner, without limitation, may deduct the Refusal Fee from any other amounts otherwise owed to Location and reserves the sole right in the calculation and determination of the Refusal Fee. Where Location requests, and Owner permits in writing, a temporary relocation or removal of the Kiosk ("Temporary Removal") such Temporary Removal shall only last for so long as agreed upon by Owner. Where such Temporary Removal exceeds the time period agreed upon by Owner and Location in writing (email being expressly sufficient), Owner shall be entitled to, and Location shall pay, one hundred ($100) dollars per day over such time period ("Removal Fee"). Owner may deduct such fees from amounts otherwise owed to Location. Location shall not be entitled to any Location Fees during any Temporary Removal. Location may not move or otherwise relocate or remove a machine under any circumstances except as expressly approved by Owner in writing .The Parties agree and acknowledge that Owner's damages would be difficult to estimate upon an extended or unexpected Temporary Removal of a Kiosk but that the Removal Fee is a reasonable method of calculating Owner's damages and the Parties agree that this provision should be read as liquidated damages rather than a penalty.

6. **Placement Forms:** In order to be valid, each Placement Form must be signed by both Owner and Location. Placement Forms shall be applicable if they are valid and not terminated or expired. This LMA cannot be terminated so long as any applicable Placement Form exists. The terms of this LMA shall be and are incorporated into each applicable Placement Form. Owner may, but is not obligated to, add special terms in the Placement Form under the section called "Special Terms" ("Special Terms"). These Special terms shall only govern over the terms of this LMA in the event of conflict as such conflict relates to pricing, Disconnection Fee(s) (defined below), and delivery of a Kiosk but no other term. Where Location indicates that a Premises is owned by a different entity owned by or which is a subsidiary of Location, as indicated in the "Additional Entity" column on the Placement Form, ("Additional Entity")  then Location hereby on behalf of the Additional Entity: a) binds such Additional Entity to the restrictions contained in this Agreement,  b) grants Owner the same rights as described in this Agreement, and c) agrees that Location shall be jointly and severally liable for the acts and omissions of such Additional Entity and its personnel as if the same were the acts and omissions of Location. Location further, on behalf of Additional Entities and any successor tenants of the underlying real property or landlords of the underlying real property of the Premises, binds successor tenants and landlords of the underlying real property of the Premises to the terms and conditions contained herein. In the event of a sale of any Premises by Location, Location shall fully cooperate with Owner in fully binding such successor tenants and/or landlords (as applicable) to the terms of this Agreement. If Location is a landlord, as indicated on a Placement Form, Location shall and hereby binds

any and all tenants of the Premises to the terms and conditions of this Agreement. Where Location is a tenant of the Premises at the time of entering into this Agreement and subsequently no longer is a tenant or otherwise no longer has the ability to perform under this Agreement, Location shall not be entitled to any Location Fee(s). Where Location is a landlord of a Premises at the time of entering into this Agreement and subsequently no longer owners such Premises or otherwise is unable to perform hereunder Location shall not be entitled to any Location Fee(s). Location, if Location and/or any of its individual Additional Entities are a tenant of a Premises, has an affirmative duty to obtain a signed copy of Owner's then-standard form joinder agreement, as provided by Owner, signed by the landlord of each Premises ("Joinder"). Failure to obtain any and all such Joinder after thirty (30) days of the Effective Date shall be, without limitation, deemed non-compliance with this Agreement.

7. **Maintenance/Repair:** Owner, at its expense, will arrange for necessary servicing and repair of each Kiosk as a result of regular operation of each Kiosk.  In the event of any Kiosk failure, damage, or other problem requiring repair, replacement, adjustment, or maintenance, Location shall notify Owner, or a person designated by Owner, within twenty-four (24) hours of first becoming aware of such failure, damage, or problem.  Location will not permit anyone, other than an authorized representative or designee of Owner, to perform any service, modification, alteration, upgrade, repair, or other work on each Kiosk without Owner's prior written approval. Owner or its representatives shall, at any reasonable time and at all times during business hours, have the right to enter into and upon the Premises for the purpose of inspecting, repairing, maintaining, or upgrading each Kiosk and observing its use.  Location shall cooperate in allowing Owner to perform maintenance, service, updates, modifications, or repairs. Owner, or Owner's agents, shall replace paper in each Kiosk when necessary and shall correct any misfeeds.  Location shall maintain the space surrounding each Kiosk in a safe, neat, and orderly condition.

8. **Inventory Requirements:** Owner shall maintain inventory of an adequate supply of paper and cryptocurrency for each Kiosk in a manner and by means determined by Owner in Owner's sole discretion.  Owner shall be responsible for keeping sufficient amounts of cash in each Kiosk at all times if each Kiosk dispenses cash. Location shall not access, change, or otherwise remove any cash from any Kiosk nor shall Location open, remove, modify, or otherwise alter any Kiosk except as expressly directed by Owner in writing.

9. **Internet & Electrical Requirements:** Location can choose to provide and maintain a dedicated business Ethernet or Wi-Fi connection for each Kiosk or Location may require the Owner to provide a wireless connection of Owner's choosing for each Kiosk. If Location elects to provide business Ethernet or Wi-Fi connection(s), Location will not remove the same without five (5) days' prior written notice to Owner. Location shall, at its expense, provide one (1) dedicated operating electrical power outlet (110v) and, once each Kiosk is operational, shall not interfere with the electrical supply or electrical cord of each Kiosk.  Both the internet connection and the electrical power outlet shall be located within two (2) feet of each Kiosk site, or an extension cord shall be provided by Location. Owner shall not be responsible for the utilities of Location.  Location shall pay for all expenses incurred for an internet connection if Location provides an ethernet or wireless connection for each Kiosk.  Location shall pay for all expenses incurred in connection with electrical power usage necessary to operate each Kiosk and related signage. Location shall not interfere with any Kiosk's electrical or internet connectivity for duration of the Agreement and Location shall not disconnect or deactivate a Kiosk or allow a Kiosk to be disconnected or deactivated. If a Kiosk is disconnected or interfered with by Location, Owner will be excused from paying the Location Fee for so long as such Kiosk remains disconnected, interfered with, or deactivated and Location shall be liable to Owner for a "Disconnection Fee" in the amount of one hundred ($100) dollars per day per Kiosk ("Disconnection Fee") until each Kiosk is reconnected, reactivated, and the interference is removed. The Parties acknowledge and agree that the Disconnection Fee is not a penalty but is instead intended to be liquidated damages. The Parties agree and acknowledge that Owner's damages would be difficult to estimate upon disconnection or deactivation of each Kiosk but that the Disconnection Fee is a reasonable method of calculating Owner's damages and the Parties agree that this provision should be read as liquidated damages rather than a penalty.  Location's liability for the Disconnection Fee will continue to accrue during the Term for so long as each Kiosk remains disconnected, interfered with, or deactivated.  Owner may retrieve such Kiosk for purposes of safe keeping, but Owner's acceptance of that Kiosk will not discharge Location of its obligation to pay the Disconnection Fee nor shall it serve to terminate this Agreement. Location agrees to pay Owner's reasonable attorney's fees, costs, and expenses in the event Owner engages counsel to collect the Disconnection Fee or otherwise acts to enforce the terms of this Agreement. Notwithstanding the foregoing, the Disconnection Fee shall not apply to any power outages which are not caused, directly or indirectly, by Location, agents, contractors, employees, or other personnel of Location, or anyone acting on behalf of or at the direction of the same or through any intermediaries. Owner may, without limitation, deduct the Disconnection Fee from any amounts otherwise due to Location and withhold any amounts otherwise due to Location in the event of a disconnection or interference.

10. **Exclusivity; Competitors:**

Location shall not permit the removal, except by Owner, of a Kiosk from any Premises for the duration of the Term (defined below).

Location shall not enter into an agreement with any Competitor or allow the placement of a Competitor's kiosk or other device which performs the same or similar functions as Owner's Kiosk on the Premises (whether inside or outside the Premises) or anywhere on the underlying real property on which the Premises are located, nor subscribe to any processing service for the purchase or sale of virtual currency on the Premises that may compete with the Owner's Kiosk during the term of this Agreement. For purposes of this Agreement, "Competitor" means any person or entity that trades virtual currency; owns or operates digital currency kiosks; offers goods or services which are competitive with those offered by Owner; or conducts, authorizes, offers or provides services and products of the type conducted, authorized, offered or provided by Owner during the Term (defined below) of this Agreement or any person and/or entity that facilitates the purchase or sale of digital currency. Location expressly acknowledges and agrees that Owner may offer additional functionality(ies) and the same, without limitation, are subject to this Section Exclusivity; Competitors.

Location agrees that Owner shall have the exclusive right to provide the goods and services of the type offered by Owner, including, but not limited to, digital currency kiosks or any terminal or service that can conduct and/or execute digital currency transactions to Location, on, around, or near the Premises, and to all other business sites occupied (including by way of ownership, lease or sublease) by Location. Location, except through Owner, shall not permit the commercial sale or transfer of or facilitation of the sale or transfer of any cryptocurrencies at, on, near, or around the Premises. Further, without limitation, Location shall not permit the direct or indirect performance of, placement of, or facilitation of any machine, device, service, or other means or methods which compete with Owner's Kiosk(s) functions or other goods or services offered by Owner under this Agreement on, around, or near the Premises.

If Location violates this Agreement by entering into an agreement with a Competitor and fails to cure such violation within ten (10) days after receipt of Owner's notice of the violation, such violation shall be, without limitation, deemed a material breach of this Agreement. Location shall notify Owner in writing within twenty four (24) hours of entering into an agreement with a Competitor and/or for a competitive service.

Without limitation, Location's obligations under this Section Exclusivity; Competitors have been assumed as a material term of this Agreement and as a material inducement to Owner to enter into this Agreement. Any breach of Location's obligations under this Section Exclusivity; Competitors shall be deemed a material breach of this Agreement. The Parties agree that Location's breach of this exclusivity agreement would cause irreparable damage to Owner and monetary damages would provide inadequate remedy to Owner. Owner will, without limitation, be entitled to seek any and all equitable relief available to Owner including, but not limited to, injunctive relief and Location expressly consents to such remedy and waives any defense thereto. In seeking such relief, Owner shall not be required to show irreparable harm nor shall Owner be required to post a bond or other security and Location expressly waives any right to the foregoing.

11. **Protection Requirements:** Location shall exercise due care for the safekeeping and protection of each Kiosk and shall ensure that each Kiosk is not unplugged or damaged. Location shall not be held liable for theft or loss of each Kiosk except in cases of fraud, gross negligence, or intentional action or omission by the Location. Owner, without limitation, shall have no liability to Location in the event of theft, damage, suit, or loss caused by each Kiosk.

12. **Ownership of Premises or Lease Term(s):** Location represents and warrants that it is the owner of the Premises or that it holds ownership of, a lease or option to renew a lease of the Premises of equal or greater length than the Initial Term (defined below) of this Agreement and any renewal thereof. If Location leases the premises, the Location shall notify Owner of any dispossessory or distress proceedings initiated against Location or the Premises within twenty-four (24) hours of being served with process of the dispossessory or distress proceedings. In the event that dispossessory or distress proceedings are initiated against Location, Owner has the right to terminate this Agreement and reclaim possession of each Kiosk.

13. **Relocation; Sale; Expansion:** In the event Location transfers or moves its business from the Premises, expands its business to additional sites, or if Location sells its business or substantially all of its assets, Location shall provide Owner with at least sixty (60) days' advance written notice of such occurrence (or as much notice as reasonably practicable) ("Expansion Notice"). Owner shall have the exclusive option to install an additional Kiosk at the Location's (and/or its successor in interest's) new business site(s), stores, and/or other locations on the same terms and conditions set forth in this Agreement (the "Option"); and Owner may exercise its Option by delivering written notice of its intent to exercise its Option within thirty (30) days from its receipt of Expansion Notice. If Expansion Notice is never received by Owner, then Owner may exercise the Option at any time after it becomes aware of the Option becoming available. Location agrees, without limitation, that, in the event of transfer, move or sale of Location's business, this Agreement remains in full force and effect as to the Location's new business site(s) and the applicable Placement Form shall be deemed amended so that the Premises shall include the Location's new business site(s). In the event of a sale of all or substantially all of the assets of Location, Location shall remain fully bound by and liable for the terms and conditions of this Agreement until and unless Location facilitates and Owner is able to enter into a binding and enforceable agreement with such successor in interest and/or purchaser and, in such

event, this Agreement shall only cease to apply to Premises which Owner maintains substantially similar rights in after entering into such binding and enforceable agreement.

14. **Term:** This LMA shall remain in effect and binding so long as an applicable Placement Form exists. This LMA shall endure from the Start Date until each applicable Placement Form between the parties is terminated or expires in accordance with this Agreement. Each Placement Form shall be effective upon the date listed as "Effective Date" on that Placement Form ("Effective Date"). The Placement Form shall, beginning upon the Effective Date, grant Owner the right to install a Kiosk at each of the Premises listed on that Placement Form. This right to install cannot be revoked by Location and failure by Owner to install a Kiosk shall not be deemed a breach of this Agreement. Owner reserves the sole discretion as to when and how each Kiosk shall be installed. Each Placement Form shall be for a term of years as indicated on the Placement Form as "Term", which shall begin upon the first installation of a Kiosk at a Premises, unless amended or terminated by written agreement signed by both Owner and Location, or terminated as set forth below (the "Initial Term").  Upon the expiration of the Initial Term, the Placement Form will automatically renew for subsequent additional terms equal to the Initial Term each on the same terms and conditions as provided herein unless Location notifies Owner of its intent not to renew by written notice at least ninety (90) days prior to expiration of the then current term (the Initial Term, taken with any renewals thereof, the "Term"). If such notice is properly provided, that Placement Form shall terminate at the end of the Term.

15. **Termination:** Upon the occurrence of a breach, the non-breaching party may terminate the Placement Form under which the breach occurred by providing ten (10) days' prior written notice to the breaching party detailing, with specificity, the alleged breach, provided that, during such notice period, the breaching party has an opportunity to cure such breach and the breach must continue for such ten (10) day period.  In addition, Owner may terminate this Agreement and/or any individual Placement Form by giving ten (10) days prior written notice to Location.  Owner has the right to terminate this Agreement and/or any individual Placement Form immediately in the event of damage, destruction, vandalism, misuse, loss, or the Owner, in good faith, believes that a Kiosk is at risk for damage, destruction, vandalism, misuse or loss.  Without limitation, even if the Agreement is terminated, Location's obligation to pay a Disconnection Fee shall survive. In the event the Agreement and/or any individual Placement Form is terminated, Owner may declare all accrued Disconnection Fees due as immediately due and payable. Location acknowledges and agrees that the only breach by Owner which Location may deem material is late payment by Owner which is more than thirty (30) days late from any cure period.

16. **Notice:** All notices required under this Agreement shall be in writing and addressed to the applicable party at the address(es) set forth on the Placement Form or to such other address that may be designated by the receiving party from time to time in accordance with this Section. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), fax or email (with confirmation of transmission or a response indicating receipt thereof), or certified or registered mail (in each case, return receipt requested). Except as otherwise provided in this Agreement, a notice is effective only (a) upon receipt by the receiving party, and (b) if the party giving the notice has complied with the requirements of this Section. All notices to Owner must include an electronic copy to legal@bitcoindepot.com or such other address as designated by Owner from time to time to be deemed effective.

17. **Disclaimer:** EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, LOCATION UNDERSTANDS AND AGREES THAT OWNER EXPRESSLY DISCLAIMS AND MAKES NO REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, OR STATUTORY INCLUDING, BUT NOT LIMITED TO, THE CONDITION OF THE KIOSK, MERCHANTABILITY, PROFITABILITY, QUALITY, OR FITNESS FOR ANY PARTICULAR PURPOSE AND OWNER EXPRESSLY DISCLAIMS THE SAME. OWNER SHALL IN NO EVENT BE RESPONSIBLE FOR AND EXPRESSLY DISCLAIMS ANY SPECIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, LOST PROFITS,  INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES  REGARDLESS OF WHETHER OR NOT OWNER WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. OWNER'S SOLE LIABILITY TO LOCATION HEREUNDER IN THE EVENT OF BREACH SHALL BE TO REMEDY ANY SUCH BREACH IN A TIMELY MANNER IN OWNER'S DISCRETION. OWNER WILL NOT BE LIABLE FOR FAILURE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT IF SUCH FAILURE IS DUE TO ACTS OR EVENTS BEYOND ITS REASONABLE CONTROL INCLUDING, BY WAY OF EXAMPLE, DUE TO WAR, STRIKES,  ACTS OF GOD, POWER OUTAGES, OR OTHER INTERVENING EVENTS.

18. **Not Assignable; Successors:** Location shall not assign, delegate, subcontract, or dispose of any of its rights or obligations under this agreement without prior written consent of Owner. Without limitation, Owner may freely assign, delegate, or subcontract any of its obligations hereunder and/or the Agreement in whole or in part. Any purported assignment by Location without the prior written consent of Owner shall be deemed null and void. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

19. **Confidentiality:** Location agrees that it shall keep secret and not disclose, except as strictly necessary to perform under this Agreement, any confidential or proprietary documents, records, or information of Owner including, but not limited to, any pricing terms, negotiations between the parties, performance information, terms of this Agreement, trade secrets, financial data, employee information, plans, intended Kiosk locations, planned deliveries, methods, demand letters, trade secrets, means, strategies, or other such information which a reasonable person in the industry of the parties hereto would know or should know to be confidential ("Confidential Information") whether the Confidential Information is marked as confidential or unmarked and regardless of whether the Confidential Information is in draft or final form. Location shall use the same means by which it protects its own confidential information to safeguard Owner's Confidential Information but, in any event, no less than a reasonable degree of care. Confidential Information shall not mean any information which is: a) entered into the public domain through no action or omission by Location or a party acting on behalf of Location and b) independently developed by Location as established by documentary evidence. Location may disclose Confidential Information as required by a valid and binding court or government order, so long as Location: a) provides prompt notice to Owner so that Owner may seek a protective order (and Location shall cooperate with Owner in seeking such an order) and b) Location only discloses such Confidential Information as expressly required by such court or government order. Owner reserves all rights, title, and interest in the Confidential Information. Upon request by Owner, Location shall return or destroy any Confidential Information in its possession within thirty (30) days of such request. The parties agree that Location's breach of this Section Confidentiality would cause irreparable damage to Owner and monetary damages would provide inadequate remedy to Owner. Owner will, without limitation, be entitled to seek any and all equitable relief available to Owner including, but not limited to, injunctive relief and Location expressly consents to such remedy and waives any defense thereto. In seeking such relief, Owner shall not be required to show irreparable harm nor shall Owner be required to post a bond or other security and Location expressly waives any right to the foregoing.

20. **Location Representations and Warranties:** Location represents and warrants that, for the entire duration of this Agreement, it: a) is fully licensed and in good standing in all jurisdictions in which it conducts business and in which the Premises are located; b) can enter into this Agreement, perform hereunder, and grant the rights contemplated herein without: i) violation of applicable law, rule, regulation, or other binding legal authority, ii) violation of or infringement upon any third party right, intellectual property, title, license, agreement, duty, or other such interest, or iii) encumbrance or other restrictions; c) has completed any and all internal or legal requirements necessary to grant the rights contained herein, enter into this Agreement, perform hereunder, and bind any Additional Entities as set forth herein; d) shall not use or permit others to use each Kiosk for any unlawful or otherwise improper purpose; AND e) it shall maintain the Premises in a stable, safe, and accessible condition.

21. **Waiver:** A waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of that party's rights to otherwise demand strict compliance with this Agreement and any and all provisions hereof. Breach by Location shall not be deemed waived by Owner unless and until Owner affirmatively and specifically waives that breach in writing. Waiver of one breach is not a waiver of further or future breach.

22. **Arbitration:** Any dispute, controversy, or claim arising out of or relating to this Agreement including, but not limited to, the breach, termination or validity of this Agreement will be submitted to arbitration as prescribed herein. The parties will agree on a single arbitrator within ten (10) days of receipt of a notice of intent to arbitrate. If the parties are unable to decide on an arbitrator, AAA (defined below) shall select an arbitrator in accordance with this section. Such arbitrator will be knowledgeable about the ATM industry. The arbitration shall be conducted in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association ("AAA"), unless otherwise provided herein. The arbitrator will be selected in accordance with AAA procedures from a list of qualified people maintained by AAA. The arbitration will be conducted in Atlanta, Georgia. The arbitrator's decision and award will be final and binding, and judgement upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereon. Without limitation, any duty to arbitrate under this Agreement will remain in effect and enforceable after termination of this Agreement for any reason. All arbitrations must be conducted in the English language. Any request for discovery and/or evidence from one party to the other party shall be narrowly tailored to the issue raised at arbitration and shall not be overly broad. At no point and under no circumstances shall either party be entitled to a trial by jury and each party expressly waives the right thereto.

23. **Entire Agreement; Controlling Document; Modification:** This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof. There are no other promises, representations, terms, conditions, or obligations other than those contained herein. This Agreement supersedes all prior communications, representations or agreements, oral or written, between the parties and shall not be modified except in writing signed by both parties. Where this LMA conflicts with a Placement Form, the LMA shall govern. No modification, amendment, alteration, or change to this Agreement shall be binding unless done so in a writing signed by both parties hereto which states that writing's intent to modify this Agreement, the LMA, or any Placement Form. Notwithstanding the foregoing, Owner may modify,

amend, alter, append, or otherwise change this LMA in Owner's sole discretion and the same shall be effective upon notice to Location and Location's continued acceptance and/or placement of a Kiosk, acceptance of payment from Owner, or other such verbal, written, or other such action which indicates acceptance shall constitute acceptance of such modification, amendment, alteration, appendix, or other such change. Notwithstanding the Section Notice, Owner may, without limitation, send the notice required in this section to any email or physical address which Owner has on file for Location and may expressly provide such notice contemporaneously with any payment mechanism.

24. **Controlling Law:** This Agreement shall be construed, interpreted, and enforced in accordance with the laws of the State of Georgia, without regard to its conflict of law principles. Subject to the Section Arbitration, the jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in Fulton County, Georgia or any county where Owner (or its successor in interest) maintains its principal place of business.

25. **Counterparts; Headings; Ambiguity:** Each Placement Form may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of the Placement Form delivered by email or other electronic delivery shall be deemed to have the same legal effect as delivery of an original signed copy of that Placement Form. Headings and captions are provided solely for convenience and shall not convey any legal right, duty, or obligation nor shall they affect interpretation of this LMA and/or any Placement Form. Ambiguity shall not be construed in favor the of the non-drafting party. Each party hereto agrees and acknowledges that this Agreement, in whole and in part, has been negotiated at arms' length. Each party has obtained, or has had the opportunity to obtain, legal counsel to review this Agreement and both parties fully understand the terms set forth herein.

26. **No Third-Party Beneficiaries**:  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to nor shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement

27. **Severability:** Where a court of competent jurisdiction or a binding arbitral body finds that any provision of this Agreement is, in whole or in part, illegal or unenforceable, such provision shall be deemed stricken from this Agreement and the remaining provisions shall remain unaffected.

28. **Survivability:** Any provision of this Agreement, the survival of which is necessary to give effect to its intent, shall survive termination or expiration of this Agreement including, but not limited to, obligations of confidentiality, Disconnection Fees, and arbitration. Without limitation, Owner's obligations of payment shall not survive termination or expiration of this Agreement.

29. **Remedies:** Remedies available to Owner shall be cumulative and not exclusive. Election of one remedy by Owner shall not preclude the election of or availability of other remedies.

30. **Covenants to Run with Land:**  It is intended that this LMA and each of the covenants, conditions, restrictions, rights and obligations set forth herein shall run with the land and shall bind every person having any fee, leasehold or other interest therein and shall inure to the benefit of the respective parties and their successors, assigns, heirs, and personal representatives.

31. **Recording:** Owner may record this Agreement (or any memorandum or notice of this Agreement) without the prior written consent of Location.

